A.A., A.B., A.C. (a minor, by M.M., his natural parent), A.D., A.E., A.F., and A.G. (all fictitious initials), individually and as representatives of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2), Plaintiffs,

v.

State of NEW JERSEY; Donald T. DiFrancesco, in his official capacity as Acting Governor, State of New Jersey; John J. Farmer, Jr., in his official capacity as Attorney General, State of New Jersey; and Carson J. Dunbar, in his official capacity as Superintendent of the New Jersey State Police, Defendants.

No. 01–4804(JEI).

United States District Court, D. New Jersey.

Dec. 6, 2001.

Peter A. Garcia, Acting Public Defender for New Jersey by Michael Z. Buncher, Deputy Public Defender, Trenton, NJ, Counsel for Plaintiffs.

Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., by Jessica A. Roth, Newark, NJ, Cooperating Counsel for the ACLU of New Jersey Foundation.

John J. Farmer, Jr., Attorney General of New Jersey by B. Stephan Finkel, Assistant Attorney General, Trenton, NJ, Attorney for Defendants.

## OPINION

IRENAS, District Judge.

The litigation before the Court is the most recent constitutional challenge to New Jersey's "Megan's Law." Plaintiffs, all of whom have been convicted of sex offenses in New Jersey and are subject to registration and community notification pursuant to N.J.S.A. 2C:7–1 et seq. (collectively referred to as "Megan's Law"), instituted this suit on October 15, 2001 challenging the constitutionality of Article IV, Section 7, Paragraph 12 of the New Jersey Constitution and recent amendments to Megan's Law authorizing the development and maintenance of "a system for making certain information in the central registry ... publicly available by means of electronic Internet technology." P.L.2001, Ch. 167 (codified at N.J.S.A. §§ 2C:7–12 to –19) (hereinafter referred to as the "Internet Registry Act"). Soon after filing an initial complaint, Plaintiffs submitted an application for preliminary injunctive relief seeking to prevent the implementation of New Jersey's Internet sex offender registry, which is statutorily authorized to become effective on January 1, 2002. P.L. 2001, c. 167 § 10.[1]

For purposes of this motion, Plaintiffs' claims can be divided into two categories.

---

1. Plaintiffs simultaneously filed a motion for class certification and an application for an order sealing certain materials filed with the Court and permitting the use of pseudonyms. The Court heard oral argument on all three motions on November 16, 2001, and subsequently signed a consent order granting certification of a class of plaintiffs containing four separate subclasses:

 *Subclass A1:* All persons found to have committed a sex offense or offenses (as defined in N.J.S.A. 2C:7–2(b)), none of which were committed on or after July 23, 2001, who, pursuant to Public Law 2001, chapter 167, now are, or in the future will be, subject to having information about them which is contained in the sex offender central registry established pursuant to N.J.S.A. 2C:7–4 made available to the public through the Internet.

 *Subclass A2:* All persons found to have committed a sex offense or offenses (as defined in N.J.S.A. 2C:7–2(b)), at least one of which was committed on or after July 23, 2001, who, pursuant to Public Law 2001, chapter 167, now are, or in the future will be, subject to having information about them which is contained in the sex offender central registry established pursuant to 2C:7–4 made available to the public through the Internet.

First, Plaintiffs allege that the Internet Registry Act, by allowing unlimited public access to certain information collected pursuant to Megan's Law's registration provisions, violates their constitutional right to privacy in: (1) their home addresses; and (2) the totality of the information assembled and posted in the Internet sex offender registry. Second, Plaintiffs contend that the retroactive application of the Internet Registry Act to those members of the plaintiff class whose underlying sex offense was committed prior to the law's enactment violates the Ex Post Facto and Double Jeopardy Clauses of the United States Constitution.[2]

For the reasons stated below, the Court will grant, in part, and deny, in part, Plaintiffs' motion for preliminary injunctive relief.

## I.

*Background:*

Since its enactment, New Jersey's Megan's Law has been the subject of series of constitutional challenges. *See Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367 (1995); *Artway v. Attorney General,* 81 F.3d 1235 (3d Cir.1996); *E.B. v. Verniero,* 119 F.3d 1077 (3d Cir.1997); *Paul P. v. Verniero,* 170 F.3d 396 (3d Cir.1999); *Paul P. v. Farmer,* 227 F.3d 98 (3d Cir.2000). Under the system of registration and notification which eventually emerged from this morass of constitutional litigation, all persons convicted of certain designated sex offenses, including those convicted prior to the law's enactment, are required to register with local law enforcement following the completion of their sentence. N.J.S.A. 2C:7–2.[3] Every registrant is required to furnish the local police with a variety of information, including their name, social security number, age, race, sex, date of birth, height, weight, hair and eye color, exact address of legal residence, and date and place of employment. N.J.S.A. 2C:7–4(b). All information collected pursuant to the Act's mandatory registration provisions is assembled and stored in a central registry maintained by the Superintendent

*Subclass B1:* All persons found to have committed a sex offense or offenses, none of which were committed on or after November 7, 2000, and who are subject to Article IV, Section 7, paragraph 12 of the New Jersey Constitution.

*Subclass B2:* All persons found to have committed a sex offense or offenses, at least one of which was committed on or after November 7, 2000, and who are subject to Article IV, Section 7, paragraph 12 of the New Jersey Constitution.

On October 22, 2001, the Court, upon motion by Plaintiffs, issued an order temporarily sealing a portion of the documents submitted to the Court which were previously filed under seal in *Paul P. v. Farmer,* pending the Court's consideration of a motion to permanently seal those documents. Plaintiffs subsequently filed a motion to permanently seal those documents and an application to proceed under pseudonyms in this litigation. At oral argument, counsel for defendants raised no objection to the motion. Accordingly, in a separate order,

issued with this opinion, the Court will grant Plaintiffs' motion for a permanent sealing order and permission to use pseudonyms in order to preserve the confidentiality of Plaintiffs' identities.

2. Plaintiffs' complaint also alleges that the Internet Registry Act violates analogous provisions of the New Jersey State Constitution and seeks a declaration that paragraph 12 of Article IV, § 7 of the New Jersey Constitution violates Plaintiffs' rights to Equal Protection under the 14th Amendment to the United States Constitution. Plaintiffs have not, however, raised these additional claims in support of their application for preliminary injunctive relief.

3. Those subject to the Act's registration provisions include persons adjudicated delinquent or acquitted by reason of insanity for commission of a designated sex offense. N.J.S.A. 2C:7–2(a).

of the New Jersey State Police. N.J.S.A. 2C:7–4(d).

Following registration, each sex offender is classified according to his risk of re-offense and the need for community notification. The prosecutor of the county where the offender resides and the prosecutor of the county in which he was convicted jointly determine, based on a matrix of criteria identified in the Megan's Law guidelines, whether the registrant poses a low (tier 1), moderate, (tier 2), or high (tier three) risk of re-offense. N.J.S.A. 2C:7–8(d)(1).[4] In compliance with the decisions of the New Jersey Supreme Court and the Third Circuit Court of Appeals, all registrants designated as either high or moderate risk offenders are provided notice and an opportunity to challenge their tier classification in a judicial proceeding in which the state has the burden of persuasion to establish the registrant's tier classification and notification by clear and convincing evidence. *See Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995); *E.B. v. Verniero*, 119 F.3d 1077 (3d Cir.1997).

Pursuant to the law's existing system of community notification, registration information is not made available to the general public, but is distributed to classes of persons with a statutorily defined need for the information depending on the classification tier assigned to each registrant. As currently defined by the statute, need for the information is based on the reasonable likelihood that an individual or group will encounter the registrant. Enti-

tlement to notification under the "likely to encounter" standard is generally based on geographical proximity to an offender's place of residence and/or places he is likely to frequent. Tier-one notification requires county prosecutors to notify only law enforcement agencies "likely to encounter" the registrant. N.J.S.A. 2C:7–8(c)(1). Tier-two notification requires county prosecutors to notify both law enforcement agencies and registered schools, day care centers, summer camps, and other children's or women's organizations providing care for potential victims in areas where the registrant is likely to be encountered. N.J.S.A. 2C:7–8(c)(2). Finally, for those registered sex offenders posing the highest risk of re-offense, a tier three classification requires county prosecutors to notify, in addition to those organizations notified under the lower-tier levels, all members of the public likely to encounter the registrant. N.J.S.A. 2C:7–8(c)(3). Tier-three notification generally extends to members of the registrant's surrounding neighborhood and places he is likely to frequent.

While breadth of notification is generally left to the discretion of the two county prosecutors (subject, of course, to judicial review), the distribution of notification must comply with the notification guidelines promulgated by the Attorney General and ultimately approved by the Third Circuit. *See Paul P. v. Farmer*, 227 F.3d 98

---

**4.** Each registrant's future risk of re-offense is determined using the "Registrant Risk Assessment Scale" promulgated by the Attorney General. The scale is a matrix of thirteen categories organized into four larger headings: (1) Seriousness of the Offense; (2) Offense History; (3) Characteristics of the Offender; and (4) Community Support. The complete list of factors is as follows: (1) Degree of Force; (2) Degree of Contact; (3) Age of Victim; (4) Victim Selection; (5) Number of Offenses/Victims; (6) Duration of Offensive Behavior; (7) Length of Time Since Last Offense; (8) History of Anti Social Acts; (9) Response to Treatment; (10) Substance Abuse; (11) Therapeutic Support; (12) Residential Support; and (13) Employment/Educational Stability. These criteria are based on a list of factors identified by an advisory counsel of experts as relevant to assessing an offenders risk of recidivism. N.J.S.A. § 2C:7–8(b).

(2000).[5] These guidelines set forth a uniform method of disseminating notification flyers which is designed to reasonably limit disclosure to those statutorily entitled to receive notification (i.e. those "likely to encounter" the registrant). *See Paul P. v. Farmer*, 92 F.Supp.2d 410 (D.N.J.2000). Two forms of notification are distributed: an unredacted form and a redacted form. *Id.* The unredacted notices contain the exact home address of the Megan's Law registrant along with the registrant's name, photograph, description, license plate number, vehicle description, and sex offender status. The redacted version of the notice form contains all of this information, but replaces the registrant's exact street address with more general information such as the block number or intersection nearest the offender's residence. Only those individuals who sign a receipt form may receive the unredacted notice.[6] Members of the community who are within the scope of the notification, but who decline to sign the receipt form, may only receive the redacted form of the notice. All those receiving notice are bound by the applicable rules of "Rules of Conduct." In general, the "Rules of Conduct" instruct recipients not to share the information contained in the notification flyer with anyone outside the household or not in their care and to otherwise refrain from publicizing the contents of the flyer to the general public. *Id.* at 411–412. The rules also admonish recipients that actions taken against the registrant, such as harassing, threatening, or physically harming the registrant, his family, or his property, are illegal and subject to prosecution. Finally, in order to further minimize the unauthorized disclosure of registry information to those persons without a statutorily-defined need for the information, the guidelines also set forth procedures governing the methods employed in the delivery of Megan's law notices. *Id.* at 412.

## The Internet Registry Act

In the November 7, 2000 general election, New Jersey's electorate approved by public referendum an amendment to the New Jersey Constitution authorizing the legislature to enact new statutory provisions permitting the disclosure of sex offender registry information to the general public. The amendment, paragraph 12 of Article IV, § 7 of the New Jersey Constitution of 1947, reads as follows:

> Notwithstanding any other provision of this Constitution and irrespective of any right or interest in maintaining confidentiality, it shall be lawful for the Legislature to authorize by Law the disclosure to the general public of information pertaining to the identity, specific and general whereabouts, physical characteristics and criminal history of persons found to have committed a sex offense. The scope, manner, and format of the disclosure of such information shall be determined by or pursuant to the terms of the law authorizing the disclosure.

Following adoption of this amendment, both houses of the New Jersey legislature enacted Public Law 2001, Chapter 167, codified at N.J.S.A. §§ 2C:7–12 to –18 ("Internet Registry Act"), which authorizes the creation of a "system for making

---

5. For a detailed description of these notification guidelines, *see Paul P. v. Farmer*, 92 F.Supp.2d 410, 411–413 (D.N.J.2000).

6. The receipt form states, in pertinent part:
 I will comply with the Order of the Court which allows me to receive the sex offender information provided to me;
 I will comply with the Megan's Law Rules of Conduct which have been provided to me;
 I will submit to the jurisdiction of the Court.
 *Paul P. v. Farmer*, 92 F.Supp.2d at 411.

certain information in the central registry ... publicly available by means of electronic Internet technology."[7] The Internet Registry Act does not replace the existing system of community notification under which individuals within a court-ordered zone of notification are provided with registry information about those offenders in their community whom they are "likely to encounter" nor does it modify the basic procedures for classifying sex offenders according to an individualized assessment of their risk of re-offense and continuing danger to the community. Rather, these recent amendments provide for the creation of a web-based sex offender registry which will operate in conjunction with but independent of the existing system of notification.

The Act contains its own set of provisions governing the content of the website and scope of disclosure, and designating those registrants to whom it will apply. The most significant feature of this recent legislation and that which forms the central basis of all of Plaintiff's challenges is the undifferentiated disclosure authorized by the Act. The legislature has specifically declared that "the public may, *without limitation*, obtain access to the Internet registry to view an individual registration record, any part of, or the entire internet registry." P.L.2001, c. 167, § 2(b).

**7.** The Internet Registry Act represents New Jersey's version of what is rapidly emerging as the next generation of Megan's Law legislation. A number of other states have similarly taken advantage of the technology afforded by the Internet and adopted statutes authorizing the creation of web-based sex offender registries. Many of these sites contain a multifield search function allowing unlimited access to information about convicted sex offenders residing throughout the state. The Attorney General has provided a list of 30 states which currently maintain sex offender Internet registry web sites. The following is a listing of each states respective authorizing statutes and sex offender registry web site addresses: Alabama, Ala.Code § 15–20–25 (*www.qsiweb.net*); Alaska, Alaska Stat. § 18.65.087 (*www.dps.state.ak.us*); Arizona, Arizona Stat. § 13–3827 (*www.azsexoffender.com*); Colorado, Colo.Rev.Stat. Ann. § 18–3–412.5 (*www.sor.state.co.us*); Delaware, Del.Code. Ann. Tit. 11 § 4121 (www.state.de.us/dsp/sexoff); Florida, Fla. Stat. Ann. § 775.21 and § 943.043 (*www.fdle.state.fl.us/Sexual* Predators/); Georgia, Ga.Code Ann. § 42–1–12 (www.ganet.org/gbi); Hawaii, Haw.Rev.Stat. Ann. § 846E–2 et seq. (*www.ehawaiigov.org/HI—SOR*); Illinois, 730 Ill. Comp. Stat. Ann. 152/115 (*www.isp.state.il.us*); Indiana, Ind. Code § 5–2–12–11 (*www.state.in.us.serv/cji—sor*); Iowa, Iowa Code § 692A.13 (*www.state.ia.us/government/dps/dci/isor/*); Kansas, Kan. Stat. Ann. § 22–4909 (amended by 2001 Kan. Sess. Laws Ch. 208 to provide explicit authority for maintenance of a statewide Internet sex offender registry) (*www.ink.org/public/kbi/kbiregoffpage.html*); Kentucky, Ky.Rev.Stat. Ann. § 17.510 (*http://kspsor.state.ky.us/*); Louisiana, La.Rev. Stat. Ann. § 15.540 et seq. (*www.lasocpr.lsp.org/socpr/*); Maryland, Md. Ann. Code art. 27, § 792 (*www.dpscs.state.md.us/sor/*); Michigan, Mich. Comp. Laws § 28.730 (*www.mipsor.state.mi.us/*); Minnesota, Minn.Stat. § 244.052 (*www.doc.state.mn.us/level3/level3.asp*); Mississippi, Miss.Code Ann. § 45–33–49 (*www.sor.mdps.state.ms.us/*); Montana, Mont.Code Ann. § 46–23–508 (http://svor.doj.state.mt.us); Nebraska, Neb.Rev. Stat. § 29–4001 et seq. (*www.nsp.state.ne.us/sor/find.cfm*); New Mexico, N.M. Stat. Ann. § 29.11A–5.1 (*www.nmsexoffender.dps.state.nm.us/*); New York, N.Y. Correct. Law § 168–q (*www.criminaljustice.state.ny.us/nsor/*); North Carolina, N.C. Gen.Stat. § 14–208.15 (*www.sbi.jus.state.nc.us*); South Carolina, S.C.Code Ann. § 23–3–490 (*www.sled.state.sc.us*); Tennessee Tenn.Code Ann. § 40–39–106 (*www.ticic.state.tn.us*); Texas, Texas Crim. P.Code Ann. § 62.01 et seq. (*http://records.txdps.state.tx.us/so—search.cfm*); Utah, Utah Code Ann. § 77–27–21.5 (*www.corrections.utah.gov*); Virginia, Va.Code Ann. § 19.2–390.1 (*www.vsp.state.va.us*); West Virginia, W. Va.Code § 15–12–5 (www.wvstatepolice.com/sexoff); Wyoming, Wyo. Stat. Ann. § 7–19–303 (*http://attorney-general.state.wy.us/dci/*).

The Act does not make available on the Internet information about all of the sex offenders registered in New Jersey. Those subject to its provisions consist of a more limited subset of comparatively more dangerous sex offenders, including tier three (high risk offenders) and, with certain exceptions, tier two (moderate risk) offenders as to whom a court has ordered community notification. N.J.S.A. § 2C:7-13(b) and (c). The Internet registry does not contain registry information of tier 1 (low risk) offenders or those tier 2 offenders as to whom a court has ordered no notification. N.J.S.A. § 2C:7-13(f). In addition, certain moderate risk offenders who have committed only a single offense are excluded from the Act, including: (1) juveniles who have been adjudicated delinquent for a sex offense; (2) registrants who have violated N.J.S.A. 2C:14-2-9 (sexual assault) or N.J.S.A. 2C:14-3 (sexual contact) where the offender was related to the victim by blood or affinity to the third degree or was a foster parent, a guardian or stood in loco parentis within the victim's household; (3) registrants who violated such sections if the victim assented to the commission of the offense, but by reason of age was not capable of giving lawful consent. N.J.S.A. § 2C:7-13(d)(1)-(3). The State may, however, override these exemptions upon a showing, by clear and convincing evidence, that "the risk to the general public posed by the registrant is substantially similar to that posed by offenders whose risk of re-offense is moderate and who do not qualify under the enumerated exceptions." N.J.S.A. § 2C:7-13(e).

The particular information contained in the registry, while somewhat more detailed, is similar to the information provided in the unredacted community notification flyers distributed to those "likely to encounter" an offender under the current system of community notification, with a few exceptions. The Internet registry will include: (1) the offender's name and any aliases used by the offender; (2) any Megan's Law sex offenses committed by the offender, including a brief description of the date and location of disposition of any offense; a general description of the offender's modus operandi, if any; (3) the determination of whether the risk of re-offense by the offender is moderate or high; (4) the offender's age, race, sex, date of birth, height, weight, hair, eye color and any distinguishing scars or tattoos; (5) a photograph of the offender and the date on which the photograph was entered into the registry; (6) the make, model, color, year, and license plate number of any vehicle operated by the offender; and (7) the street address, zip code, municipality, and county in which the offender resides. N.J.S.A. § 2C: 7-13(g). However, unlike the notification fliers distributed under the current system of community notification, the Internet registry will not include information about an offender's place of employment or schooling.

In enacting the law, the Legislature declared that "public access to registry information is intended solely for the protection of the public and is not intended to impose additional criminal punishment upon any convicted sex offender." N.J.S.A. § 2C:7-12. Consistent with this purpose, the Act contains certain provisions designed to limit misuse of the registry for purposes inconsistent with the Act's purpose in promoting public safety. For instance, the law expressly prohibits the use of registry information for the purpose of "applying for, obtaining, or denying health insurance, insurance, loans, credit, education, scholarships, or fellowships, benefits, privileges or services provided by a business establishment (unless for a purpose consistent with the enhancement of public safety), or housing or accommodations." N.J.S.A. § 2C:7-

16. The Act also requires the posting of warnings that misuse of registry information to "threaten, intimidate, or harass" may be subject to prosecution and establishes new criminal offenses proscribing the use of registry information to commit a crime or disorderly persons offense. Id.; N.J.S.A. § 2C:7–14(a).[8] Finally, the Act authorizes the Attorney General or county or municipal prosecutor having jurisdiction, or any persons aggrieved by "a pattern or practice of misuse" of the registry, to bring legal action for appropriate relief. N.J.S.A. § 2C:7–16(d).

## II.

■ Plaintiffs seek a preliminary injunction enjoining the State from commencing operation of the Internet sex offender registry. A district court should grant preliminary injunctive relief only if: (1) plaintiffs are likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiffs; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest. *See Maldonado v. Houstoun,* 157 F.3d 179 (3d Cir.1998).

In light of the fundamental constitutional issues raised by Plaintiffs, the availability of preliminary injunctive relief will turn primarily on whether plaintiffs have sufficiently demonstrated a reasonable likelihood of success on the merits with respect to each of their constitutional claims.

## A.

Plaintiffs maintain that they are likely to prevail on their claim that the retroactive application of the Internet Registry Act to registrants whose commission of their underlying sex offenses preceded enactment of the legislation imposes additional criminal punishment in violation of the Ex Post Facto and Double Jeopardy Clauses of the United States Constitution. The Third Circuit's decision in *E.B. v. Verniero,* 119 F.3d 1077 (1997), in which it held that the existing system of community notification does not inflict "punishment" in violation of the Double Jeopardy or Ex Post Facto clause, provides the background for assessing the merits of Plaintiffs' claims.

■ The Ex Post Facto Clause prohibits the retroactive application of a law that "inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798).[9] The Double Jeopardy Clause forbids "multiple punishments for the same offense." *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).[10] Because "punishment" is generally presumed to have the same meaning for purposes of both constitutional provisions, the thresh-

---

**8.** N.J.S.A. § 2C:7–14(c) provides that "any person who uses information inclosed pursuant to this act to commit a crime shall be guilty of a crime of the third degree. Any person who uses information disclosed pursuant to this act to commit a disorderly persons offense shall be fined not less than $500 or more than $1,000, in addition to any other penalty or fine imposed." To *assist in the* prosecution of such offenses, the Act further provides that "evidence that a person obtained information about an offender from the Internet registry within one year prior to committing a criminal offense against that offender shall give rise to an inference that the person used information in violation" this provision. N.J.S.A. 2C:7–14(e).

**9.** Article I, Section 10 of the United States Constitution provides that "no state shall ... pass any ex post facto law." U.S. Const. Art. I § 10.

**10.** The Fifth Amendment of the U.S. Constitution similarly provides that no person shall "be subject for the same offense to be put twice in jeopardy of life and limb." U.S. Const., Amend. V.

old issue for purposes of evaluating both claims is whether the challenged measure constitutes punishment. *See Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (applying single "punishment" analysis for both clauses); *see also, E.B. v. Verniero*, 119 F.3d 1077, 1092 (3d Cir.1997); *Cutshall v. Sundquist*, 193 F.3d 466, 476–477 (6th Cir.1999).

At the outset, the Court observes that the Supreme Court's Ex Post Facto and Double Jeopardy jurisprudence has been the source of much confusion, providing no "single formula for deciding which legislative measures constitute punishment and which do not." *E.B.*, 119 F.3d at 1095 (citing *California Department of Corrections v. Morales*, 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)). In the absence of a uniform set of principles, this Court's analysis of this central question is informed by the Third Circuit's decision in *E.B.* and Supreme Court's subsequent treatment of this issue in *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). In *E.B.*, the Third Circuit addressed Ex Post Facto and Double Jeopardy challenges to the Megan's Law's original system of community notification. Applying the three prong inquiry formulated in *Artway v. Attorney General of the State of New Jersey*, 81 F.3d 1235 (3d Cir.1996), the Court examined the "actual purpose" of the law's notification provisions as expressed by the legislature, the "objective purpose" of the legislation (in terms of the law's proportionality and the historical treatment of analogous measures), and, finally, its potentially adverse "effects" on those subject to public notification, and ultimately concluded that the dissemination of information about moderate and high risk Megan's Law registrants beyond law enforcement within the Act's guidelines for community notification did not inflict "punishment" for purposes of the Ex Post Facto or Double Jeopardy clauses.[11] In evaluating the "actual intent" of the legislation, the Court afforded "substantial deference" to the legislature's declared remedial purpose in protecting the public and preventing future sex crimes. *E.B.*, 119 F.3d at 1105. The Court further found no objective basis for questioning the express remedial intent of the legislature. The Court concluded that the dissemination of information about Tier 2 and 3 sex offenders beyond law enforcement to those reasonably certain to encounter such registrants was "reasonably related" to the legislation's nonpunitive goals: "identifying potential recidivists, notifying those members of the public who are likely to interact with such recidivists to the extent necessary to protect the public safety, and helping prevent future incidents of sexual abuse." Id. at 1098. The Court also rejected comparisons between the dissemination of registry information and historical punishments

---

**11.** In *Artway*, the Third Circuit upheld the registration provisions of Megan's Law against claims that mandatory registration violated the Ex Post Facto and Double Jeopardy clauses of the United States Constitution. In addressing the threshold inquiry of whether the registration component of the law constituted "punishment," the Court observed the "confused state" of the Supreme Court's evolving jurisprudence with regard to this issue. 81 F.3d at 1254. Undertaking to derive a test for punishment from several key Supreme Court cases, the Court developed a multi-part test that looks to: (1) "the legislature's subjective purpose in enacting the challenged measure"; (2) its "objective purpose in terms of proportionality and history"; (3) "the measure's effects." Id. As will be discussed, the Supreme Court has more recently clarified several important aspects of its jurisprudence in this area, suggesting that the test for punishment articulated by the Third Circuit in *Artway* and subsequently applied in *E.B.* no longer provides the appropriate approach to this threshold question.

such as public shaming, humiliation and banishment, which, if apt, may have provided an objective basis for regarding the measure as punitive. *See id.* at 1099–1100. Finally, the Court concluded that neither the direct or indirect effects of community notification rose "to the level of extremely onerous burdens that sting so severely as to compel a conclusion of punishment." *Id.* at 1102.

Shortly after the Third Circuit's decision in *E.B.*, the Supreme Court issued its opinion in *Hudson v. United States,* clarifying several aspects of its Double Jeopardy jurisprudence and more clearly articulating the proper framework for determining whether a legislative measure constitutes criminal punishment. *See* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). In addressing whether a statutory scheme for imposing monetary penalties and occupational debarment on bank officers constituted "punishment" for double jeopardy purposes, the Court applied a two-part inquiry:

> Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. A court must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Even in those cases where the legislature has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy as a civil remedy into a criminal penalty.

*Hudson,* 522 U.S. at 99–100, 118 S.Ct. 488 (internal quotation marks and citations omitted).

■ In assessing whether either the objective purpose of the legislation or its effects are sufficiently punitive to overcome a presumption favoring the legislative judgment, the Court instructed that the factors previously outlined in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) provide "useful guideposts." These relevant factors include:

> "(1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may be connected is assignable for it; (7) whether it appears excessive in relation to the alternative purpose assigned."

*See Hudson,* 522 U.S. at 99–100, 118 S.Ct. 488 (quoting *Mendoza–Martinez,* 372 U.S. at 169, 83 S.Ct. 554).

■ Each of these factors, the Court explained, must be evaluated "in relation to the statute *on its face* " and "only the clearest proof will suffice to override the legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (citing *United States v. Ward,* 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)).

■ In addition to articulating the proper test for distinguishing between remedial or regulatory measures and criminal penalties, the Court signaled a retreat from its decision in *United States v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), and reaffirmed its approach in *United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980),

in two important respects.[12] First, although the label affixed by the legislature is not dispositive, the Court's decision in *Hudson* makes it clear that the legislature's manifest intent is entitled to substantial deference. A court may reject the legislature's stated remedial intent and regard a statute as punitive only where the party challenging the statute provides "the *clearest proof*" that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention to deem it civil. *Hudson*, 522 U.S. at 100, 118 S.Ct. 488 (quoting *United States v. Ward*, 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)) (emphasis added).[13] The Court criticized *Halper* for erroneously bypassing the traditional threshold question of whether the legislature intended the particular legislative measure to be "civil" or "criminal" and focusing instead merely on whether the challenged statutory sanction was "so grossly disproportionate to the harm caused as to constitute punishment." *Id.* at 101, 118 S.Ct. 488. Second, the Court specifically disapproved of an approach to the second prong of the inquiry—determining whether a statute intended to be civil is so punitive as to

transform it into a criminal penalty—which assigns dispositive weight to any single *Kennedy* factor. In focusing primarily on whether the challenged statutory sanction was so disproportionate to the harm sought to be remedied as to constitute punishment, the decision in *Halper*, the Court explained, had deviated from firmly-established Double Jeopardy jurisprudence by "elevating a single *Kennedy* factor—whether the sanction appeared excessive in relation to its nonpunitive purposes—to dispositive status." *Hudson*, 522 U.S. at 101, 118 S.Ct. 488. As *Kennedy* itself emphasized, when evaluating whether these factors present the "clear proof" that a legislative measure is punitive despite the legislature's avowed remedial intent, "no one factor should be considered controlling as they 'may often point in differing directions.'" *Id.* (quoting *Kennedy*, 372 U.S. at 169, 83 S.Ct. 554).

In evaluating plaintiffs' Ex Post Facto and Double Jeopardy claims, the Court will apply the two-prong inquiry articulated in *Hudson* against the background of the Third Circuit's analysis in *E.B.*[14] The

**12.** Notably, the Supreme Court granted certiorari, in part, because of "concerns about a wide variety of novel double jeopardy claims spawned in the wake of *Halper*," including those raised in *E.B.*, challenging the Megan's Laws existing system of community notification as violative of the Double Jeopardy clause. *Hudson*, 522 U.S. at 98 & n. 4, 118 S.Ct. 488.

**13.** This aspect of the decision in *Hudson* merely further confirms a trend acknowledged by the Third Circuit in *E.B.*, 119 F.3d at 1096, and foreshadowed in the Supreme Court's previous decisions. *See United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (finding "little evidence, much less the 'clearest proof'" that the challenged forfeiture proceedings "are so punitive in form or effect as to render them criminal despite Congress' intent to the contrary");

*Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ("we will reject the legislature's manifest intent only where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil'") (quoting *United States v. Ward*, 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)).

**14.** While the Supreme Court's decision in *Hudson* suggests that *Artway* no longer provides the appropriate test for determining whether a statutory measure should be classified as "punishment," there appears to be substantial overlap between the factors relied on in *E.B.* and those which comprise the "intent-effects" test articulated in *Hudson*. The threshold question for both tests is whether the "actual intent" of the legislature in

first prong of this two-step inquiry requires the court to ascertain whether the legislature, in enacting the legislative measure, "indicated either expressly or impliedly a preference for one label or the other." *United States v. Ward,* 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). If this Court concludes that the legislature's manifest intent was to impose additional criminal punishment, the inquiry ends. If, however, the Court determines that the legislature did not intend the statute to be considered punitive but rather sought to accomplish remedial or regulatory goals, we must inquire whether the statute is nonetheless "so punitive either in purpose or effect that it should be considered to constitute punishment." *Id.* at 249, 100 S.Ct. 2636.

### A. Legislative Intent

 In ascertaining the "intent" of the legislature, the Court focuses on the declared purpose of the legislature, as well as the structure and design of the statute. Here, the legislature has made the remedial purposes of the legislation unmistakably clear. Recognizing that "knowledge of whether a person is a convicted sex offender at risk of re-offense could be a significant factor in protecting oneself and one's family, or those in care of a group or community organization, from recidivist acts of" convicted sex offenders, the legislature has authorized posting on the Internet of certain registry information about a subset of Megan's

Law registrants who are determined to present a particularly high risk of re-offense in order to enable susceptible members of the public "to undertake appropriate remedial precautions to prevent or avoid placing potential victims at risk." N.J.S.A. § 2C:7–12. Indeed, the legislature has expressly disavowed any intent to inflict additional punishment on Plaintiffs for their past conduct. Public access to the Internet registry, the Act's preamble explains, "is intended solely for the protection of the public, and is not intended to impose additional criminal punishment upon any convicted sex offender." *Id.* As the Attorney General explains, the Internet registry supplements the existing system of community notification by making certain registry information about particularly dangerous registrants available to individuals who do not reside within close geographical proximity to such offenders but nevertheless may at some point have a particular need for the information to avoid becoming the victim of an offender's recidivist criminal acts. Consistent with this purely remedial purpose, the legislature has prescribed additional criminal penalties to deter the misuse of the information for purposes inconsistent with the Act's non-punitive goals. *See* N.J.S.A. § 2C:7–16. In addition, the legislature has exempted certain registrants from the Act's provisions where it has determined, based on the relative low risk of re-offense posed by a particular offender, that making such information "available to the

---

adopting the challenged statutory measure (whether express or implied) was to punish past conduct or to remedy a perceived societal problem. The second prong of *Hudson*'s "intent-effects" test essentially collapses the second two prongs of the *Artway* analysis— the "objective purpose" and "effects" of the Act—into a single inquiry: whether the legislation is so punitive in either its objective purpose or effect as to negate the legislature's remedial intent. Many of the factors which

the Supreme Court has indicated are relevant to this question coincide with the factors which comprise the "objective purpose" and "effect" prongs of the *Artway* analysis, including the relationship between the remedial goals of the legislation and its means of effectuating those goals and the historical treatment of analogous measures. Thus, to the extent possible, the Court incorporates the Third Circuit's analysis in *E.B.* into its evaluation of the factors outlined in *Kennedy.*

general public via the Internet would not necessarily serve the public safety purposes of the law." N.J.S.A. § 2C:7–13(d)(1)–(3) (excluding from the Internet registry tier 2 offenders whose sole sex offense was committed was committed as a juvenile or was an incest offense or an offense where the victim consented but was underage (e.g. statutory rape)).[15]

## B. Effect

 Having concluded that the actual legislative purpose in enacting the Internet Registry Act was remedial, the Court turns to the "effects" prong to determine whether, notwithstanding the legislature's declared remedial intent, the statute should be regarded as punitive for purposes of the Ex Post Facto and Double Jeopardy Clauses. For purposes of the present motion for preliminary injunctive relief, the Court must determine whether Plaintiffs' have demonstrated a reasonable likelihood of providing the "clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 99, 118 S.Ct. 488. Evaluating Plaintiffs' claims against the background of the Third Circuit's analysis in *E.B.* and the Supreme Court's jurisprudence on this issue, the Court concludes that Plaintiffs have not sufficiently demonstrated a reasonable likelihood of satisfying this heavy burden.

Before proceeding to consider each of the factors identified in *Kennedy*, the Court notes that, as a general matter, Plaintiffs' renewed Ex Post Facto challenge to Megan's Law focuses almost exclusively on the "excessive" scope of disclosure authorized by the Internet Registry Act. Specifically, Plaintiffs argue that this feature of the legislation affects the analysis with respect to nearly every factor identified by the Court in *Kennedy*, leading inescapably to the conclusion that the Act imposes additional criminal punishment despite its avowed remedial intent. (See Pl.'s Br. at 25) ("As to nearly all of the factors, it is the excessiveness of the notification authorized by the Act that requires a finding that the Act is punitive."). However, as is clear following the Court's decision in *Hudson*, each *Kennedy* factor must be evaluated individually and no one factor should be given controlling weight. Moreover, the Court observes that much of the Third Circuit's previous analysis in *E.B.* with respect to the "effects" prong of the inquiry is not dependent on the scope of the public disclosure authorized by the statute. With these two general observations, the Court turns to evaluate each of the *Kennedy* factors.

### (1) Affirmative Disability or Restraint.

The Internet registry does not work an affirmative disability or restraint in the sense traditionally associated with punishment. *See Hudson*, 522 U.S. at 104, 118 S.Ct. 488 (concluding that sanctions directly imposing a monetary fine coupled with

---

**15.** The preamble to the legislation explains the basis for excluding these one-time offenders from the provisions of the Internet Registry Act:

... the interest in facilitating rehabilitation of juveniles who have been adjudicated delinquent for the commission of one sex offense, but who do not present a relatively high risk of re-offense, justifies the decision to limit public access to information about

such juveniles through the Internet. Other instances where the Legislature has determined that making sex offender registry information available to the general public through the Internet would not necessarily serve the public safety purposes of the law include moderate risk offenders whose sole sex offense involved incest or consensual sex.

N.J.S.A. § 2C:7–12.

lifetime debarment from employment in the banking industry do not approach the "'infamous punishment' of imprisonment" and therefore "do not involve an 'affirmative disability or restraint,' as that term is normally understood."). The disclosure of registry information does not involve any direct, government-imposed disability or restraint analogous to those the Supreme Court has deemed to be punitive. *See E.B.* at 1101 ("Under Megan's law, New Jersey has not deprived appellants of their freedom or their citizenship. The state has imposed no restrictions on a registrant's ability to live and work in a community, to move from place to place, to obtain a professional license or to secure government benefits."); *see also, Femedeer v. Haun,* 227 F.3d 1244, 1250 (10th Cir.2000) (concluding that Utah's Internet notification system "does not *by itself* prohibit sex offenders from pursuing any vocation or a vocation available to other members of the public" and therefore "does not work an affirmative disability or restraint in the sense traditionally associated with punishment") (emphasis added); *Cutshall v. Sundquist,* 193 F.3d 466, 474 (6th Cir. 1999) (similarly observing that notification "imposes no restraint whatsoever upon the activities of a registrant" who remains "free to live where he chooses, come and go as he pleases, and seek any employment he wishes.").

Moreover, as the Supreme Court has recently clarified, in considering the *Kennedy* factors, including whether the statute imposes an affirmative disability or restraint, we must evaluate the purpose and effect of the statute "on its face." *See Hudson,* 522 U.S. at 100, 118 S.Ct. 488. In arguing that the Act imposes affirmative disabilities on those subject to the Internet registry, Plaintiffs point to the severe social consequences which may accompany public disclosure of a registrant's offense, including lost employment and housing opportunities and an increased risk of unlawful private violence, threats, and harassment. These "practical hardships," however, cannot be directly attributed to the operation of statute itself, but are rather, as the Third Circuit observed in *E.B.,* the "indirect effects" of the disclosure—"actions that members of the community may take as a result of learning of the registrant's past, his potential danger, and his presence in the community." 119 F.3d at 1102–3; *see also, Doe v. Pataki,* 120 F.3d 1263 (1997) (limiting its focus on the "damaging effects" of disclosure on the lives of offenders to those directly "attributable" to the Act's notification provisions: "Though the Act is doubtless the "but for" cause of some of these incidents—those perpetrated by persons who gained knowledge of the offender's past crime and current location only because of notification—these incidents are not consequences imposed by the Act."). On its face, the statute merely mandates that certain accurate registry information about a subset of Megan's law registrants be made available to the general public via the Internet. Any "punitive effects," such as ostracism or incidents of private violence, are therefore incidental to the legislature's overriding remedial purpose of providing "susceptible members" of the public with the information they need to take precautions to protect themselves and their families and are more directly the consequence of the public reaction to the registrant's conviction. *See E.B.* ("the risk of private violence stems primarily from a registrant's past criminal activity"); *see also, Doe v. Pataki* ("although notification conveys to the public the information that prompts some people to take unlawful action against the convicted sex offender, it is the offender's prior conviction—or more precisely the offender's criminal act itself—that motivates such hostile action.").

The legislation, by its terms, neither condones nor tolerates the potentially adverse social consequences which may follow disclosure. Indeed, as previously noted, the Act contains a number of provisions designed to minimize any unintended negative consequences resulting from public disclosure. Warnings and newly proscribed criminal penalties serve to deter misuse of registry information for purposes inconsistent with the non-punitive goals of the legislation. The law also expressly prohibits use of registry information in denying "health insurance, insurance, loans, credit, education, scholarships or fellowships, benefits, privileges or services provided by any business establishment (unless for public safety purposes), or housing or accommodations." N.J.S.A. § 2C:7–16(c).[16] Accordingly, because the"practical hardships" to which Plaintiffs make reference come about as incidental to a valid remedial solution to a serious public safety problem—protecting the public from the danger of recidivism by sex offenders—this factor does not support classification of the Act as a punitive measure.[17]

## (2) Historical Treatment of Analogous Legislative Measures.

The second *Kennedy* factor asks whether, from a historical perspective, the legislative measure has been viewed as punishment. As the Third Circuit observed in *E.B.*, "where analogous measures have traditionally been regarded by our society as serving punitive purposes," there may be "an objective basis for regarding the measure as punishment" despite the legislature's avowed non-punitive intent. 119 F.3d at 1093; *see also, Artway*, 81 F.3d 1235 ("[W]ithout a convincing counter-rationale, something understood as punishment for so long simply 'cannot be said

---

16. Plaintiffs argue that, despite these provisions, the harsh consequences for sex offenders which may flow from notification are "compounded exponentially" by the unlimited public access afforded by the Internet Registry Act. Pl.'s Br. at 26. However, the anecdotal evidence presented by plaintiffs does not support such dire predictions. Many of plaintiffs' exhibits are recycled from previous legal challenges to Megan's Law and refer to the negative social consequences attendant on community notification generally. Plaintiffs place particular emphasis on certain affidavits describing incidents of public retribution during the period of unfocused, "wily-nily" public notification preceding this Court's order directing the State to establish adequate safeguards to prevent unnecessary public disclosure of registry information. However, this evidence does not support Plaintiffs' exaggerated claims that extending disclosure of registry information to the general public will significantly increase the frequency and intensity of such incidents and dramatically magnify the severity of the burdens imposed on registrants and their families. While unrestricted public access to registry information may provide access to individuals who intend to misuse the information and will take no heed of the additional criminal penalties imposed by the Act for such misuse, as a practical matter, any increased risk to offenders and their families is likely to be marginal. *See Femedeer v. Haun*, 227 F.3d 1244, 1253 (observing that, as a practical matter, "the farther removed one is from a sex offender's community and from Utah generally, the less likely one will be to have an interest in accessing [Utah's Internet sex offender registry]. To a large extent, therefore, the dangers resulting from widespread availability are negated by the decreasing likelihood that the information will actually be obtained.").

17. Plaintiffs further argue that the "excessive" public disclosure authorized by Act, by unnecessarily and unreasonably infringing on Plaintiffs' privacy interests in ensuring that registry information not disclosed "wily-nily" to those without a legitimate public-safety related need for it, the Act imposes an "affirmative disability" on Plaintiffs. This aspect of the Act, which requires an evaluation of the "fit" between the legitimate remedial goals of the statute and the means employed, will be addressed within the context of the final factor in the *Kennedy* analysis.

solely to serve a remedial purpose, but rather can only be explained as also serving retributive or deterrent purposes.' ") (quoting *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)).

In addressing this factor, Plaintiffs attempt to draw what is by now a familiar comparison between public disclosure of registry information and historic forms of punishment such as public shaming, humiliation, and banishment. Specifically, Plaintiffs argue that "because the Act authorizes excessive disclosure, it is more analogous to historical sanctions that have traditionally been regarded as punishment, such as branding and "scarlet letters, which generally broadcast an offenders' criminal status than it is to measures such as wanted posters which serve the remedial purpose of bringing a fugitive to justice." (Pl.'s Br. at 27.) However, the Third Circuit in *E.B.* rejected this analogy for reasons that do not depend on the scope of the public disclosure:

> Public shaming, humiliation, and banishment all involve more than the dissemination of information.... [T]hese colonial practices inflicted punishment because they either physically held the person up before his or her fellow citizens for shaming or physically removed him or her from the community. The 'sting' of [New Jersey's sex offender notification scheme] results not from their being publicly displayed for ridicule or shaming but rather from the dissemination of accurate public record information about their past criminal activities and a risk assessment by responsible public agencies based on that information. This distinction makes a substantial difference when one looks for the relevant historical understanding of our society.

119 F.3d at 1099. The Ninth Circuit Court of Appeals has similarly rejected the contention that the disclosure or dissemination of registry information beyond law enforcement personnel is analogous to historical shaming punishments, such as branding and scarlet letters, which "generally required the physical participation of the offender, and typically required the physical confrontation between the offender and members of the public." *Russell v. Gregoire,* 124 F.3d 1079, 1091 (9th Cir. 1997) (upholding Washington's sex offender community notification statute). Indeed, the Ninth Circuit reached the same conclusion in a recent Ex Post Facto challenge to Alaska's unrestricted Internet sex offender registry, suggesting that the unlimited scope of public disclosure authorized by the Act did not alter the Court's analysis of this factor. *See Doe v. Otte,* 259 F.3d 979, 989 (9th Cir.2001). The decisions of other Courts of Appeals further support this conclusion. *See Doe v. Pataki,* 120 F.3d 1263 (2d Cir.1997) (observing that "traditional shaming penalties such as branding or the stocks enlisted the offender's physical participation in his own degradation" and are therefore distinguishable from the public disclosure provisions of New York's sex offender registration law which "require no participation by the offender" and "impose no physical pain, mark, or restraint on the offender."); *Cutshall v. Sundquist,* 193 F.3d 466, 475 (6th Cir.1999) (similarly rejecting comparisons between the dissemination of information and traditional shaming punishments, such as banishment and the pillory).

Facilitating public dissemination of registry information more closely resembles, albeit imperfectly, the "wanted posters" of the frontier days or the old "hue and cry" of colonial times, both designed to alert the public to the presence of a potentially dangerous felon in the community so that individuals could protect themselves and

their families and assist law enforcement in their apprehension. *See E.B.,* 119 F.3d at 1077 (suggesting that quarantine notices and "posters warning that a pictured individual is abroad in the community and to be regarded as armed and dangerous" provide more apt analogies to Tier 2 and Tier 3 notification); *Russell,* 124 F.3d at 1092 ("It is at least as appropriate to compare the notification law to "wanted" posters and warnings about escaped prisoners or other dangerous persons—practices that have not been regarded as punishment, though they disclose essentially the same information, may arouse public excitement, and may carry a greater risk of vigilantism."). As the Third Circuit has observed, these traditional government warnings, like the disclosure of registry information about moderate and high risk sex offenders, "communicate not only facts about past events but also the fact that a public agency has found a significant future risk based on those events." *E.B.,* 119 F.3d at 1101. In any event, absent a closely analogous historical precedent, we are unwilling to conclude that this factor meaningfully contributes to the "clear proof" required to overcome the presumption in favor of the legislature's stated remedial purpose.

*(3) Finding of Scienter.*

The third *Kennedy* factor directs the Court to consider whether the Act is triggered only upon a finding of scienter. Traditionally, sanctions conditioned upon a finding of mens rea are generally likely to be considered criminal rather than civil in nature. Conversely, statutory measures that apply without regard to an individual's mental culpability to achieve some broader public interest unconnected to fault are considered civil in nature. *See Kansas v. Hendricks,* 521 U.S. 346, 362, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ("The existence of a scienter requirement is customarily an important element in distinguishing criminal from civil statutes. The absence of such a requirement . . . is evidence that . . . the statute is not intended to be retributive.").

The Supreme Court's analysis in *Hudson* suggests that the relevant inquiry when considering this factor is whether the Act's requirements may be imposed *only* upon a finding of scienter. *See* 522 U.S. at 104, 118 S.Ct. 488 (concluding that a law authorizing debarment from the banking industry did not come into play "only" on a finding of scienter where the law applied to any person 'who violates' any of the underlying banking statutes, without regard to the violator's state of mind); *see also, Doe v. Otte,* 259 F.3d at 989 (9th Cir.2001) ("Our inquiry when considering [the third *Kennedy* factor] is whether the Act's requirements may be imposed *only* upon a finding of scienter.") (citing *Hudson,* 522 U.S. at 104, 118 S.Ct. 488) (emphasis in original); *Femedeer v. Haun,* 227 F.3d 1244, 1252 n. 3 (10th Cir. 2000); *Cutshall v. Sundquist,* 193 F.3d 466, 475 (6th Cir.1999).

Here, it cannot be said that the provisions of the Internet Registry Act come into play *only* on a finding of scienter. As is true of the system of registration and notification generally, those who are potentially subject to having their registration information posted on the Internet registry include not only those convicted of a criminal offense incorporating a mens rea component, but also those who have evidenced their propensity for recidivism and continuing danger to the community through conduct resulting in an acquittal by reason of insanity. N.J.S.A. § 2C:7–2(a). Accordingly, this factor does not support the classification of the Act as punishment.

*(4) Traditional Aims of Punishment.*

The fourth factor in the *Kennedy* analysis—whether the Act promotes the traditional aims of punishment—does not point conclusively in favor of either classification. The prospect of having one's criminal history, along with various pieces of identifying information assembled and posted in an Internet registry accessible to the general public may presumably deter some persons from perpetrating sex offenses. However, any deterrent effect attributable to the Act is merely incidental to the statute's stated remedial purpose. Moreover, as the Supreme Court has noted, the fact that a statute intended by the legislature to accomplish prospective, remedial purposes may incidentally serve to deter others who might otherwise emulate the conduct of those subject to the Act does not necessarily lead to the conclusion that the legislative measure must be classified as punitive. Many purely remedial legislative measures may serve to convince those who would prefer not to be subject to the provisions to refrain from engaging in conduct which could potentially subject them to the statute's provisions. Indeed, as the Supreme Court has observed, to hold that the mere presence of a deterrent purpose renders ... sanctions "criminal" for double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation ..." *Hudson* at 496, 118 S.Ct. 488.

Moreover, the Act's purpose cannot fairly be characterized as retributive. *See Artway v. Attorney General of the State of New Jersey,* 81 F.3d 1235 (describing retributive measures as those which mete out "vengeance for its own sake" and "do not seek to affect future conduct or solve any problem except for realizing 'justice.' "). As is true of Megan's law generally, the Act does not "affix culpability for prior conduct", but rather considers the fact of such conduct, along with other factors, in the tier classification process to make an individualized assessment of the extent to which the registrant poses a continuing risk to the community. *See Hendricks,* 521 U.S. 346, 117 S.Ct. 2072 (finding that a Kansas statute authorizing the involuntary civil commitment of compulsive sex offenders is "not retributive because it does not affix culpability for prior criminal conduct" but rather uses such conduct "solely for evidentiary purposes, either to demonstrate that a mental abnormality exists or to support a finding of future dangerousness."). While all those convicted of certain enumerated sex offenses (as well as those acquitted by reason of insanity) are required to register, the Internet registry is reserved for those registrants determined to pose the greatest risk of re-offense. Only those for whom the risk of re-offense is moderate or high are subject to having their registration information made available in the Internet registry. Disclosure under the Act is, in this way, calibrated to the individual registrant's propensity for future sexually deviant behavior and is entirely consistent with the prospective, remedial purpose of the Act.

*(5) Application to Conduct Similarly Proscribed by Criminal Statute.*

The fifth *Kennedy* factor examines whether the conduct to which the statute's provisions apply is already punishable as a crime. In general, the fact that the conduct triggering the provisions of the challenged statute is criminalized by another statute "seems to point toward a finding that [the measure] is criminal in nature." *United States v. Ward,* 448 U.S. 242, 249–250, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). Here, as is true of the registration and notification provisions generally, only those found to have engaged in conduct which is also proscribed by criminal statute may be subject to the provi-

sions of the Internet Registry Act. This feature of the challenged legislation therefore appears to provide some support for the contention that the purpose or effect of the Act is to impose criminal punishment. However, the Supreme Court has also long held that the legislature "may impose both a criminal and a civil sanction in respect to the same act or omission." *U.S. v. Ursery,* 518 U.S. 267, 292, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (quoting *Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 82 L.Ed. 917 (1938)). In light of this observation and the legitimate prospective, remedial goals the Act is intended to achieve, this factor does not point decisively in favor of any particular classification. *See Doe v. Pataki,* 120 F.3d 1263, 1281 (observing that "the fact that the Act's requirements are triggered by a criminal conviction is common to all regulatory disabilities that result from a prior conviction, for instance, the loss of the right to vote."). Because this factor is inconclusive, the Court ascribes only limited weight to this feature of the legislation. *See Femedeer v. Haun,* 227 F.3d at 1252–53 (similarly according "limited weight" to this factor in light of the connection between notification and legitimate civil purposes).

### (6) Alternative Non-punitive purpose/Excessiveness

The final two factors under the *Kennedy* analysis require the Court to determine whether there is a prospective, remedial purpose that can reasonably be assigned to the Act, and if so, whether the means employed to achieve the goals of the statute "appear excessive in relation to the alternative non-punitive purpose assigned." *Kennedy,* 372 U.S. at 169, 83 S.Ct. 554.[18] Plaintiffs concede, as they must, that the State has a compelling interest in protecting the public from the recidivist acts of sex offenders which justifies disclosing registration information beyond law enforcement personnel to those members of the public who are reasonably certain to encounter a registrant or who otherwise have a legitimate public safety-related need for the information. *See E.B.,* 119 F.3d at 1104 (characterizing the state's legitimate remedial goals—identifying potential recidivists, notifying those who are likely to interact with such recidivist to the extent necessary to protect the public safety and helping prevent future incidents of sexual abuse—as compelling); *Paul P. v. Verniero,* 170 F.3d 396 (3d Cir.1999) ("The public interest in knowing where prior sex offenders live so that susceptible individuals can be appropriately cautioned does not differ whether the issue the registrant's claim under the Double Jeopardy or Ex Post Facto Clauses, or is the registrant's claim to privacy."). However, they argue that the unlimited scope of disclosure authorized by the Act unnecessarily

**18.** While *Kennedy* lists these factors separately, these two factors appear to be very closely related. Once it has been determined that the challenged legislation was not motivated retributive animus, but rather actually intended to accomplish legitimate non-punitive goals, the Court must essentially determine whether the means employed are "rationally related" to the statute's legitimate remedial goals. *See E.B.,* 119 F.3d at 1093. The relevance of the relationship between these two factors appears to be two-fold: (1) the absence of a reasonable "fit" between the means and ends of the legislation may provide an objective basis for determining that the legislation was actually motivated by retributive animus, *see id.* ("While it is true that 'even remedial sanctions carry the sting of punishment,' only if the sting is not 'reasonably related' to the remedial goal would an objective observer be justified in perceiving a punitive purpose.") (quoting *Artway,* 81 F.3d 1235, 1260); and (2) the direct "effects" of the statute on those subject to it may be so excessively harsh, as a matter of degree, as to compel a conclusion that the Act constitutes punishment despite the legislature's genuine remedial purpose. *See Id.*

intrudes on their privacy interests insofar as it dispenses with any limitations on the dissemination of this information to persons for whom a particular offender may be of no concern. The central thrust of plaintiffs' argument, therefore, is that the absence of a "reasonable fit" between the legitimate public safety goals of the legislation and the method of notification employed converts what the legislature has deemed purely remedial into punitive within the meaning the Ex Post Facto and Double Jeopardy clauses.

The Court finds this argument unpersuasive for two reasons. First, as the preceding analysis makes clear, a careful examination of the other *Kennedy* factors provides little, if any, support for classifying the Internet Registry Act as a punitive measure. Plaintiffs' are, therefore, left to argue that the "excessiveness" of the public disclosure authorized by the Act alone suffices to overcome the presumption in favor of the legislature's stated remedial intent. However, while there is some language in the Third Circuit's opinion in *E.B.* suggesting that the excessiveness of notification in relation to the legitimate remedial purposes of the statute may be dispositive on issue of whether the statute inflicts "punishment," the Supreme Court has since expressly disapproved of an approach which assigns dispositive weight to any single factor outlined in *Kennedy*. *See Hudson*, 522 U.S. at 101, 118 S.Ct. 488; *see also Femedeer*, 227 F.3d at 1249 (10th Cir.2000) (finding that the district court erred "by elevating the excessiveness inquiry to nearly dispositive status to the exclusion of the many other factors that the Supreme Court has listed for consideration"). This Court is, therefore, unwilling to conclude based on this factor

alone that Plaintiffs' have sufficiently demonstrated a reasonably likelihood of adducing the "clearest proof" necessary to negate the express remedial intent of the legislature.

Second, in evaluating the significance of this factor, the relevant question is whether the disclosure of registry information beyond that which is fully supported by the legislation's legitimate remedial purposes renders the statute so exceedingly severe as to overcome the presumption in favor of the legislature's state remedial intent. The Court views this question as distinct from the issue of whether the Act, by expanding notification beyond those with a particular need for the information, unnecessarily infringes on plaintiffs' privacy interests. Even were we to accept that allowing unlimited access to the Internet registry impermissibly intrudes on Plaintiffs' privacy interests, this would not necessarily compel the conclusion that the "effects—or 'sting'—of a measure is so harsh 'as a matter of degree' that it constitutes 'punishment.'" *See Artway v. Attorney General of the State of New Jersey*, 81 F.3d at 1266 (citing *California Dep't of Corrections v. Morales*, 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)).

The State has a "compelling interest," the Third Circuit has recognized, in protecting the public which fully justifies disclosure of information about "moderate" and "high risk" sex offenders to numerous individuals in the general public under the existing community notification guidelines.[19] In *E.B.*, the Third Circuit held that the "direct effects" of this system of community notification, pursuant to which notification flyers are actively distributed

---

**19.** For instance, under the notification guidelines upheld by the Third Circuit in *Paul P. II*, 227 F.3d 98, every parent of a child attending a school within the court-authorized zone of

notification is entitled to receive unredacted notice containing all registry information for Tier 3 offenders potentially posing a continuing threat to those in the area.

to a significant segment of the public, "clearly do not rise to the level of extremely onerous burdens that sting so severely as to compel a conclusion of punishment." 119 F.3d at 1102. In light of the broad disclosure authorized by the existing system of notification, any incremental burden on Plaintiffs' protected privacy interests imposed by extending disclosure of registry information, much of which is otherwise available, albeit less conveniently, in public records, to the general public is unlikely to be so severe as to transform a legislative scheme that has been determined by the Third Circuit to be nonpunitive into punishment. *Cf., Paul P. v. Farmer,* 227 F.3d 98 (3d Cir.2000) (characterizing the burden imposed on registrants' privacy interests by unauthorized disclosure of their home address as "minimal"). Indeed, as the Third Circuit observed in *E.B.,* the Supreme Court's recent decision in *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), and "the long line of cases on which it relies, counsels that bona fide remedial legislation may inflict very substantial individual hardship without implicating the Ex Post Facto and Double Jeopardy clauses." *E.B.* at 1103. Notably, the Court in *Hendricks* concluded that the involuntary civil commitment of convicted sex offenders for a potentially indefinite period following the expiration of their prison terms, while clearly imposing an affirmative, state-imposed restraint on the liberty of such individuals, did not constitute "punishment" for purposes of these two clauses. 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501. Indeed, the Supreme Court has upheld numerous state statutes imposing exceedingly harsh disabilities against ex post facto challenges. *See, e.g., DeVeau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (blanket prohibition on felons working for waterfront unions); *Galvan v. Press,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (deportation for prior membership in the Communist party); *Hawker v. People of New York,* 170 U.S. 189, 196, 18 S.Ct. 573, 42 L.Ed. 1002 (prohibition of physicians, convicted of felony, from practicing medicine).

Nor does the absence of "reasonable fit" between the statute's legitimate non-punitive goals and the means employed necessarily provide a sufficient objective basis for impugning the express remedial intent of the legislature. In evaluating this factor, courts have never insisted on a "perfect fit between means and ends." *E.B.,* 119 F.3d at 1098. Certainly, it cannot fairly be said that "a reasonable legislator motivated solely by the declared remedial goals of the Internet registry—ensuring that *all persons* for whom "knowledge of whether a person is a convicted sex offender at risk of re-offense could be a significant factor in protecting" themselves, their families, and those in their care from becoming the victim of the recidivist acts of the offender have access to information identifying those who pose such a risk— could not have believed that "the means chosen were justified by those goals." *Id.*

The Court is therefore unwilling to conclude that Plaintiffs' have adequately demonstrated a reasonable likelihood of adducing the "clear proof" necessary to negate the legislature's expressly stated remedial intent and classify the Act as "punishment" for purposes of the Ex Post Facto and Double Jeopardy clauses. Accordingly, Plaintiffs' motion to enjoin the retroactive application of the Internet Registry Act to those members of the plaintiff class convicted of a sex offense prior to the law's enactment will be denied.

### B.

The crux of Plaintiffs' privacy claims centers on the implications of the undiffer-

entiated disclosure of registration information via the Internet. Specifically, Plaintiffs contend that unlimited public access to Plaintiffs' home addresses under the Internet Registry Act cannot be reconciled with recent Third Circuit precedent regarding the permissible scope of Megan's Law notification. Plaintiffs further argue that the Act violates their as yet unrecognized right to privacy in the compilation of the information contained in the Internet registry.

*General Framework for Analyzing Plaintiffs' Privacy Claims:*

■■■■ While the full scope of constitutionally-protected privacy rights has not been precisely delineated, the types of privacy interests entitled to constitutional protection can be grouped into two categories: (1) the individual interest in avoiding disclosure of personal matters ("confidentiality interest"), and (2) the interest in independence in making certain kinds of important decisions without governmental interference ("autonomy interest"). *See United States v. Westinghouse*, 638 F.2d 570, 577 (3d Cir.1980) (citing *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). The latter decisions have generally involved "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). The privacy claims asserted here invoke the first category of constitutionally-protected privacy interests, the right to control the disclosure of personal information about oneself and to insist that an individual's private affairs not be made public by the government.

■■■■ While Courts have generally devoted considerably less attention to clarifying *the nature and scope of protection* for individual interests in maintaining the confidentiality of personal information, the Third Circuit has developed a general framework for analyzing these types of privacy claims. In determining whether information is entitled to privacy protection, the threshold question is "whether it is within an individual's reasonable expectations of confidentiality." *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 112–113 (3d Cir.1987). Generally, "the more intimate and personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Id.* Applying this standard, the Third Circuit has interpreted the right to control the disclosure of personal information identified in *Whalen* to extend to a person's medical records and certain financial information. *See Westinghouse*, 638 F.2d at 577 (extending privacy protection to medical records); *Fraternal Order of Police*, 812 F.2d at 115 (recognizing a constitutionally-protected interest in limiting the disclosure of certain financial records).

■■■■ The right to control access to and limit the disclosure of confidential information is not, however, absolute and must often yield to certain legitimate governmental interests.[20] *See Trade Waste*

---

**20.** The language of the Court of Appeals' decisions in this area suggest that the Court will typically employ a deferential "rational basis" standard of review in evaluating the constitutionality of government-mandated disclosure. *See, e.g., Westinghouse*, 638 F.2d at 575. However, the Court has suggested that there may be some government-mandated requests for information which would implicate both confidentiality interests and the other prong of the Supreme Court's privacy jurisprudence, that dealing with an individual's "autonomy interest" in making certain types of intimate, personal decisions free from undue governmental interference. In this instance, where mandatory compliance with a statutory scheme for collecting certain personal information may significantly deter or "chill" an

*Management Ass'n, Inc. v. Hughey*, 780 F.2d 221, 234 (3d Cir.1985) ("[T]here is no absolute protection against disclosure. Disclosure may be required if the government interest in disclosure outweighs the individual's privacy interest."); *Westinghouse*, 638 F.2d at 577–78 (observing that while medical information is a "matter which the individual is ordinarily entitled to retain within the 'privacy enclave where he may lead a private life,'" there are some governmental interests, such as public health and other public concerns, that "may support access to facts an individual might choose to withhold."). As is often true in assessing the protection to be afforded individual privacy interests, evaluating Plaintiffs' privacy claims involves the delicate task of weighing the individual's interest in confidentiality against the government's interest in collecting certain information for legitimate governmental purposes.[21] An individual may be required to furnish the government with certain confidential information where justified by proper government interests in promoting public health and safety. *See, e.g., Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (upholding a New York state requirement that physicians record on official government forms certain information concerning prescriptions for potentially harmful drugs, including identification of physician, pharmacy, drug, dosage, and patient's name, address, and age); *Westing-house*, 638 F.2d at 580 (holding that the "strong public interest in facilitating the research and investigations of NIOSH [National Institute for Occupational Safety and Health] justify [the] minimal intrusion into the privacy which surrounds the employees' medical records."); *Fraternal Order of Police*, 812 F.2d at 114 (holding that the Philadelphia police department could permissibly require applicants for a special unit to produce certain sensitive medical information over their objection because it was "directly related to the interest of the police department [and by extension the public] in selecting officers who were physically and mentally capable of handling the positions for which they were applying."); *see also, Id.* at 116 (holding that the "strong public interest in avoiding corruption among officers assigned to a unit designed to perform investigations in areas traditionally susceptible to corruption outweighs police officers' limited privacy expectations in the financial information sought by the questionaire.").

The government's collection and use of otherwise confidential information necessarily entails limited disclosure of the information to those who, consistent with the proper governmental purposes, are authorized to receive it. *See, e.g., Westinghouse*, 638 F.2d 570 (strong public interest in facilitating research and investigation of potential health hazards at West-

individual's exercise of fundamental privacy rights, a more exacting level of judicial scrutiny may be appropriate. *See Fraternal Order of Police*, 812 F.2d at 114 n. 5 (citing *Thornburgh v. American College of Obstetricians*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986)).

21. In *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 578 (3d Cir.1980), the Third Circuit outlined several factors which courts should consider in balancing the harm caused by an intrusion into an individual's privacy against the legitimate public interests served by a statute mandating the collection and/or disclosure of such information: (1) the type of record requested; (2) the information it contains; (3) the potential for harm in an subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosures; (6) the degree of need for access; and (7) "whether there is an express statutory mandate, articulated in public policy, or other recognizable public interest militating toward access."

inghouse plant justified sharing plant employees sensitive medical information with NIOSH researchers and outside contractors bound by contractual confidentiality provisions); *Fraternal Order of Police*, 812 F.2d 105 (strong public interest in police officer qualified for special law enforcement unit supported disclosure of personal medical and financial information to those police department officials responsible for the .application process). However, as the Third Circuit has emphasized, the "fact that protected information must be disclosed to a party who has a particular need for it . . . does not strip the information of its protection against disclosure to those who have no similar interest." *Fraternal Order of Police*, 812 F.2d at 118. In order to maintain the crucial constitutional balance between an individual's interest in preserving the confidentiality of protected information and the state's legitimate interests in collecting and sharing such information with those who have a proper and specific need for it, the Court has frequently required that the government implement reasonably adequate safeguards to limit the unnecessary disclosure of confidential information to those with no particular need for the information. *See Id.* at 117–18 ("One of the crucial factors in weighing the competing interests referred to in Westinghouse is 'the adequacy of safeguards to prevented unauthorized [i.e., unnecessary] disclosure.' "); *see, e.g., Id.* at 118 (finding no adequate safeguards for

preventing unnecessary public disclosure of sensitive financial and medical information supplied by applicants); *Westinghouse*, 638 F.2d at 580 (finding adequate safeguards limiting disclosure to NIOSH employees and preserving the confidentiality of plant employee's medical information).

*Constitutionally–Protected Privacy Interest in the Confidentiality of One's Home Address:*

Applying this analytical framework, the Third Circuit ultimately upheld the current system of community notification against the claim that public disclosure of information collected pursuant to the Megan's Law impermissibly infringes on registrants' constitutionally protected privacy interests. *See Paul P. v. Verniero*, 170 F.3d 396 (3d Cir.1999) (*"Paul P. I"*); *Paul P. v. Farmer*, 227 F.3d 98 (3d Cir.2000) (*"Paul P. II"*). The Court accepted the claim that registrants' possess a "non-trivial" privacy interest in the confidentiality of their precise home address which is entitled to constitutional protection. *See Paul P. I*, 170 F.3d at 404.[22] In addressing the nature and significance of state interests underlying the notification provisions, the Court was presented with a somewhat novel situation. As the Court subsequently recognized in *Paul P. II*, the "unique" purpose of the notification provisions of Megan's Law—supplying members of the

---

**22.** In *Paul P. I*, the Third Circuit rejected this court's conclusion that individuals required to register under Megan's Law had no reasonable expectation of privacy in their home address. Relying primarily on several Freedom of Information Act cases, as well as the New Jersey Supreme Court's opinion in *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995), the Court observed what it characterized as a "general understanding that home addresses are entitled to some privacy protection, whether or not so required by statute." 170 F.3d at 404. The Court was therefore "unwilling to hold that absent a statute, a person's home address is never entitled to privacy protection," and instead accepted the appellant's claim that there is *"some* nontrivial privacy interest in one's home address by persons who do not wish it disclosed." *Id.* (emphasis in original). While this language appears to suggest a reluctance on the part of the Court to conclusively decide this issue, this analysis was subsequently endorsed by the Court's opinion in *Paul P. II*. For purposes of this motion, the Court considers this issue settled.

public with information collected by the State about individuals in their community—distinguished the legislation from the limited intergovernmental disclosure it had upheld in its previous decisions. *See* 227 F.3d at 105–106. (comparing the limited interagency disclosure at issue in *Westinghouse* and *Fraternal Order of Police* with the public dissemination authorized by Megan's Law's notification provisions). However, whereas the narrow state interests articulated in *Westinghouse* and *Fraternal Order of Police* had been insufficient to justify public disclosure of the private information being collected by the State, the Court concluded in *Paul P. I* that the State had a "compelling interest" in extending the disclosure of registration information, including each registrant's precise home address, beyond law enforcement personnel to the public so that "susceptible individuals can appropriately be cautioned." 170 F.3d at 404. The Court, explicitly weighing the State's legitimate interest in promoting public safety against the privacy interests of those required to register under the Act, found that this compelling state interest outweighed the individual registrants' limited "non-trivial" privacy interest in preventing the public disclosure of their home addresses. The Court emphasized, however, that the privacy interests of individual registrants, while limited, were nonetheless entitled to protection from disclosure to members of the public with "no particular need for the information." *Id.* at 406. Accordingly, the Court, while holding that the Megan's Law notification provisions were constitutional on their face, remanded the case back to this Court with explicit instructions to consider whether "plaintiff's *interest in assuring that information be disclosed only to those with a need for it* has been accorded adequate protection." *Id.* at 406.

As is clearly evident from the subsequent decisions of both this Court and the Court of Appeals, the careful tailoring of notification in a manner reasonably calculated to limit disclosure of a registrant's home address to those with "a particular need for it" while avoiding "disclosure to those who have no similar need" was critical to maintaining the delicate constitutional balance between the individual registrants' privacy interests and the legitimate goals of the statute. Adequate safeguards against unnecessary public disclosure were necessary to sustain operation of the law's existing notification provisions against constitutional challenge. In *Paul P. v. Farmer*, on remand from the Third Circuit, this Court declared that the Megan's Law notification provisions, as administered under the Attorney General's original guidelines, were unconstitutional to the extent that the State had failed to implement reasonably adequate safeguards to prevent the unnecessary disclosure of registrants' home addresses to members of the public who are not reasonably "likely to encounter" a registrant and who otherwise have no particular need for the information. *Id.* In this Court's opinion, the Court emphasized the importance of these safeguards in sustaining the notification procedures against a privacy challenge:

Defendants ask the Court to overlook any deficiencies in the current system [of community notification] in light of the compelling purposes served by the Act. However, the procedural safeguards contained within the Attorney General Guidelines are *crucial to maintaining the constitutional balance between plaintiffs' privacy interests and the goals of the statute. See Fraternal Order of Police*, 812 F.2d at 117 ("One of the crucial factors in weighing the competing interests referred to in *Westinghouse* is 'the adequacy of safeguards to prevent unauthorized disclosure.' ") (quoting *United States v. Westinghouse*

*Electric Corp.,* 638 F.2d 570, 577 (3d Cir.1980)). If, in practice, these safeguards fail to limit the release of plaintiffs' home addresses to those persons with a statutorily defined need for this information, a different constitutional balance would result.

*Paul P.,* 80 F.Supp.2d at 325. (emphasis added). This Court therefore enjoined any further notification under the existing procedures and directed the State to redraft the Attorney General's notification guidelines to reasonably limit disclosure of registrants' home addresses to those statutorily entitled to receive such information. *Id.* In compliance with the Court's order and opinion, the Attorney General submitted a revised set of notification guidelines. *See Paul P. v. Farmer,* 92 F.Supp.2d 410, 411–412 (D.N.J.2000). Although the Third Circuit ultimately upheld this revised system of notification, it did so only after

affirming this Court's conclusion that the State's revised notification guidelines "adequately safeguard [each registrant's] interest in assuring that information is disclosed only to those individual who have a particular need for it." *Paul P. II,* 227 F.3d at 107.

■■■ The unlimited public disclosure of registrants' home addresses authorized by the Internet Registry Act simply cannot be reconciled with the Third Circuit's holdings in *Paul P. I* and *II.*[23] The proposed Internet registry, which the state maintains is intended not to replace but rather to supplement the existing system of notification, dispenses with any safeguards designed to carefully limit disclosure of protected information to individuals and groups with a legitimate public safety-related need for the information.[24] As the State concedes, in making the home addresses of a subset of Megan's law regis-

**23.** The State suggests that reliance on the Third Circuit's *Paul P.* decisions is misplaced insofar as it ignores the distinction between active notification (as affirmatively delivered through the current community notification scheme) and passive dissemination (through an Internet registry that requires individuals who wish to access the information to take some affirmative step to do so). As a practical matter, this distinction has little significance and is largely illusory in light of the nature of Internet technology. The posting of registry information on the Internet facilitates widespread dissemination by reducing registry information to an electronic format in which it is accessible with extraordinary ease to any individual, including young children, with a basic understanding of computers. Even a relatively unsophisticated search engine would permit a significant segment of the public to navigate the web site and retrieve registry information with very little effort. Once obtained, plaintiffs' home addresses can be shared with other members of the public who may not have Internet access. Moreover, the State has cited no legal authority to suggest that this distinction has any constitutional significance in determining an individual's reasonable expectations of confi-

dentiality. In any event, to the extent that the State invites this court to re-examine the question of whether plaintiffs have a constitutionally-protected privacy interest in their home address, and to re-balance the state's interest in disclosing that information against the plaintiffs' privacy interests based on this tenuous distinction, this Court must decline to do so.

**24.** Under the Act, there are no "unauthorized disclosures," as registry information is made freely available to the general public. While the Act contains a number of provisions aimed at sanctioning and deterring misuse of the information posted on the Internet registry once it has been obtained, these provisions do not serve to limit access to registrants' home addresses by persons without a proper or specific need for the information. These provisions do not suffice to protect the interest of registrants in assuring that this confidential information is disclosed only to those individuals who have a particular need for it. Any unwarranted intrusion into plaintiffs' protected privacy interests is complete the moment the information is released to an individual with no proper or specific need for the information.

trants available to the general public via the Internet, the Act also permits access to this information by "people who will never actually encounter any registered sex offenders in New Jersey nor have any particular need for the information." (Def.'s Br. at 14). In doing so, the Act impermissibly strips this protected information of any protection from unnecessary public disclosure.

The State argues that the public interest in alerting individuals who are not statutorily entitled to receive this information under the current restrictive community notification system but who nonetheless run the risk of actually encountering a comparatively high risk sex offender or otherwise have a particular need for information about such offenders justifies making the information freely accessible to these unidentified members of the public via the Internet. However, while the State may have a compelling interest in ensuring that individuals "with a particular need for the information," but not readily identifiable based on fixed criteria such as geographical proximity, have access to the information necessary to protect themselves and their families, a necessary corollary implicit in the Third Circuit's *Paul P.* decisions is that any broader interest in informing the public at large or the global community about the whereabouts of those previously convicted of sex offenses is significantly diminished and, in any event, does not suffice to justify the disclosure of protected confidential information to innumerable individuals without a legitimate public safety-related need for the information.

*Cf., E.B. v. Verniero,* 119 F.3d at 1107 (observing that while the State "has a compelling interest in protecting its citizens by giving prompt notification to potential victims and relevant caregivers with respect to registrants accurately determined to be Tier 2 or Tier 3 risks," the State "has no substantial interest in notifying persons who will not come into contact with the registrants" and therefore presumably have no particular need for the information). In any event, even if we accept that the formation of an unrestricted Internet registry better serves the State's compelling interest in ensuring that "susceptible individuals" have access to the information necessary to protect themselves and their families, the Third Circuit's *Paul P.* decisions make clear that disclosure of protected information to persons with a particular need for it, even where justified by a compelling state interest, does not "strip the information of protection against disclosure to those who have no similar need." *See Paul P. I,* 170 F.3d at 406 (quoting *Fraternal Order of Police,* 812 F.2d at 117). Plaintiffs' privacy interests in the controlling disclosure of their home addresses, while limited, are nevertheless entitled to constitutional protection against "wily-nily" disclosure to the general public. Accordingly, the Court concludes that Plaintiffs' have clearly established a reasonable likelihood of success on the merits of their claim that the Internet Registry Act impermissibly infringes on Plaintiffs' constitutionally protected privacy interests in the confidentiality of their home addresses.[25]

**25.** In reaching this conclusion, the Court does not intend to suggest that the Third Circuit's *Paul P.* decisions necessarily foreclose altogether the creation of an Internet-based registry which permits access to the home addresses of particularly dangerous sex offenders to members of the public who do not reside within the court-ordered zone of notification but nonetheless have "a particular need for this information." The State may, for instance, manage to devise a password system which restricts access to the Internet registry to individuals with a legitimate public-safety related need for the information. Moreover, neither the decisions of the Third Circuit nor this court necessarily preclude the State from

*Constitutionally-protected Privacy Interest in the Totality of the Plaintiffs' Registry Information:*

■ With the exception of Plaintiffs' home addresses, none of the individual pieces of information included in the Internet registry is the type of personal, intimate information generally considered to be within an individual's reasonable expectations of confidentiality. Indeed, the Court of Appeals has specifically recognized that information regarding an individual's criminal history, as well as the basic identifying information accompanying it, is not constitutionally entitled to privacy protection. *See Paul P. I,* 170 F.3d at 403 ("To the extent that plaintiff's alleged injury stems from the disclosure of their sex offender status, alone or in conjunction with other information, the District Court's opinion is in line with other cases in the court and elsewhere holding specifically that arrest records and related information are not protected by a right to privacy."). The remainder of the information included in the Internet registry is similarly generally publicly available and therefore not entitled to privacy protection. *See Paul P. II* at 106 (observing "that within the Unredacted Notice, there is an abundance of information, e.g. name, date of birth, sex, and conviction, the disclosure of which does not implicate a privacy interest ..."); *see also, Doe v. Poritz,* 142 N.J. 1, 81, 662 A.2d 367 (1995) (concluding that Megan's Law registrants have "no expectation of privacy in many of the individual pieces of information disclosed, such as [the registrant's] name, convictions, appearance, place of employment or school attended, and the fact of public

disclosure of these pieces information, rather than mere disclosure to the State, does not alter the analysis."); *Russell v. Gregoire,* 124 F.3d 1079, 1094 (9th Cir. 1997) (observing that similar information collected and disseminated pursuant to Washington's sex offender registry statute is "already fully available to the public and is not constitutionally protected."). Plaintiffs' nevertheless contend that the Internet Registry Act, by authorizing the compilation and widespread public disclosure of a package of information that, while publicly available, would otherwise remain scattered and practically forgotten in various public records, implicates plaintiffs' constitutionally-protected confidentiality interests.

In *Paul P. v. Verniero,* this Court addressed a similar privacy claim brought against Megan's Law's original system of community notification. Relying, in part, on the Third Circuit's opinion in *E.B.,* this Court rejected the proposition that a compilation of public information implicates a constitutionally-protected privacy interest that would otherwise not exist with respect to each individual piece of information but for the fact of compilation. *See* 982 F.Supp. 961, 966 (D.N.J.1997) ("It is of little consequence whether this information is disclosed piecemeal or whether it is disclosed in compilation."). On appeal, the Third Circuit disagreed with this Court's suggestion that its decision in *E.B.* was necessarily dispositive of plaintiffs' privacy claims and framed the legal issue presented by the plaintiffs' "compilation" claim as "whether the degree of effort needed to assemble otherwise available but dispersed

adopting more flexible statutory criteria which allow the State to more accurately identify those members of the community who may have "a particular need for the information." Either of these alternatives may present an opportunity for the State to

remedy the perceived problem of under-notification in a manner more carefully calculated to better achieve the goals of the statute without unreasonably impinging on the "nontrivial" privacy interests of the Plaintiffs' in the confidentiality of their home address.

information ought to be considered as a factor in determining the reasonableness of an individual's expectation of privacy in the compiled data." *Paul P. I*, 170 F.3d at 404. However, the Court ultimately decided that it was unnecessary to specifically address plaintiffs' claimed "compilation" interest in light of its conclusion that any constitutionally-protected privacy interest in controlling the disclosure of registry information must give way to the compelling state interest supporting Megan's Law notification. Notably, the Court signaled that, when presented squarely with this issue, its characterization in *E.B.* of key cases, such as *United States Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), would be afforded considerable deference. *See Paul P. I*, 170 F.3d at 401.[26] The Court therefore places particular emphasis on the Third Circuit's past treatment of this case in assessing the merits of Plaintiffs' asserted privacy interest in the totality of the information collected in the sex offender registry.

In support of their claim, Plaintiffs rely heavily on the Supreme Court's decision in *Reporters Committee*, as well as on the New Jersey Supreme Court's interpretation of that decision. Plaintiffs confidently predict that the Third Circuit is likely to hold, as did the New Jersey Supreme Court in *Doe v. Poritz*, that the "compilation and dissemination of information effected by Megan's Law notification implicates a constitutionally protected privacy interest." 142 N.J. 1, 87, 662 A.2d 367 (1995). The Third Circuit's treatment of these cases, however, belies this conclusion.

Both the Third Circuit and this Court have repeatedly stressed that *Reporter's Committee* is inapposite on the issue of those privacy interests entitled to protection under the United States Constitution. *See E.B.*, 119 F.3d 1077, 1100, n. 21 (3d Cir.1997); *see also, Paul P. I*, 170 F.3d at 400 (3d Cir.1999); *Paul P. v. Verniero*, 982 F.Supp. 961, 967 n. 10 (D.N.J.1997). In *Reporter's Committee*, the issue before the Court was "whether the disclosure of the contents of [an FBI rap sheet] to a third party 'could reasonably be expected to constitute an unwarranted invasion of personal privacy' within the meaning of the Freedom of Information Act." 489 U.S. 749, 751, 109 S.Ct. 1468, 103 L.Ed.2d 774. The Freedom of Information Act (FOIA) mandates broad public disclosure of government documents. A specific statutory exception exempts records or information compiled by law enforcement from the disclosure provisions of the statute but "only to the extent that the production of such [materials] ... could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Drawing primarily from federal statutes and regulations, as well as the Court's significant body of decisions regarding the scope of disclosure required under FOIA, the Court found considerable evidence of a "Congressional intent to protect the privacy of rap-sheet subjects, and a concomitant recognition of the power of compilations to affect personal privacy that outstrips the combined power of the bits of information." *Id.* at 749, 109 S.Ct. 1468. In light of this discernible congressional policy limiting public access to such documents, the Court held that the FBI

**26.** In *E.B.*, the Court of Appeals observed that "[w]hile the Supreme Court recognized in *Reporters Committee* that 'Rap Sheets' are protected under the privacy-for-law-enforcement records exemption to the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(C), such protection reflects a Congressional policy judgement, not federal Constitutional law." 119 F.3d at 1100 n. 21 (citing *Reporters Committee*, 489 U.S. at 762 n. 13, 109 S.Ct. 1468).

rap sheets, while containing pieces of information each of which was at one time publicly available, were exempt from disclosure under the privacy-for-law enforcement-records exemption to FOIA. *Id.* While some portions of the opinion allude to the possibility of a broader right to keep personal matters from being publicly disclosed, the Court's holding clearly reflects its understanding of congressional policy, not federal Constitutional law. *See E.B.,* 119 F.3d at 1100 n. 21. Indeed, the Court's opinion emphasizes this important distinction between the statutory and constitutional protection for individual privacy interests, expressly stating that its conclusion with regard to the privacy interests protected by FOIA did not articulate a constitutional right to privacy. *See Reporters Committee,* 489 U.S. at 762, n. 13, 109 S.Ct. 1468 ("The question of the statutory meaning of privacy under FOIA is, of course, not the same as the question whether a tort action might lie for invasion of privacy or the question of whether an individual's interest in privacy is protected by the Constitution."). Congress can no doubt extend limitations on the disclosure of personal information collected by the government beyond that mandated by the Constitution. *Compare, e.g., Reporter's Committee with Paul v. Davis,* 424 U.S. 693, 712–714, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (finding no constitutional privacy right implicated by publication of the name of an arrested but untried shoplifter). Plaintiff's reliance on the Supreme Court's analysis in *Reporter's Committee* is therefore misplaced.

Plaintiffs also suggest that the Third Circuit, if given an opportunity to directly address the issue, is likely to concur with the holding of the New Jersey Supreme Court in *Doe v. Poritz* recognizing a constitutionally protected privacy interest in

preventing the compilation and dissemination of otherwise public information. *See* 142 N.J. at 84–87, 662 A.2d 367. In reaching its conclusion, the New Jersey Supreme Court relied exclusively on its interpretation of the Supreme Court's opinion in *Reporter's Committee.* However, for the same reasons stated above, the Third Circuit has explicitly rejected the New Jersey Supreme Court's interpretation and application of *Reporters Committee. See E.B.,* 119 F.3d at 1103 n. 23; *Paul P. I,* 170 F.3d at 400–01 ("We do not agree with the Supreme Court of New Jersey's conclusion in *Doe* that the recognition in Reporter's Committee of a statutory right to privacy for "Rap Sheets" under FOIA dictates that a federal Constitutional right to privacy is implicated by notification.") and is, therefore, unlikely to be persuaded by the New Jersey Supreme Court's analysis.

█ Apart from these decisions, Plaintiffs point to no other persuasive legal authority supporting their asserted right to limit the compilation and dissemination of the totality of the information contained in the Internet registry. To the contrary, the Court of Appeals for the Ninth Circuit upheld Washington state's version of Megan's law against a similar claim that the "accumulation and dissemination" of information about those subject to the Act's registration and notification provisions violated registrants' constitutional right to privacy. *See Russell v. Gregoire,* 124 F.3d 1079, 1093–94 (9th Cir.1997); *see also Doe v. Kelley,* 961 F.Supp. 1105, 1112 (W.D.Mich.1997) (denying a preliminary injunction of Michigan's version of Megan's Law because "plaintiffs have failed to demonstrate the existence of a legitimate privacy interest in preventing the compilation and dissemination of truthful information that is already, albeit less convenient-

ly, a matter of public record").[27] In the absence of persuasive contrary authority supporting the proposition that the government's compilation and dissemination of otherwise publicly available but dispersed items of personal information gives rise to a reasonable expectation of confidentiality, this Court is unwilling to conclude that Plaintiffs' have adequately demonstrated a reasonable likelihood of prevailing on this claim. Accordingly, with the exception of Plaintiffs' home addresses, Plaintiffs motion to enjoin disclosure of registry information under the Internet Registry Act will be denied.

### III.

◼ In light of the foregoing analysis, the Court concludes that Plaintiffs' have demonstrated a likelihood of success on the merits of their claim that the Internet Registry Act violates their constitutionally protected privacy interest to the extent that it permits the unlimited public disclosure of Plaintiffs' home addresses. Moreover, the Court has little difficulty concluding that Plaintiffs have satisfied the remaining components of the preliminary injunction standard. In the absence of an injunction preventing the unlimited public disclosure of Plaintiffs home addresses, Plaintiffs will undoubtedly suffer irreparable harm to their constitutionally-protected privacy interests. Generally, in order to demonstrate "irreparable harm," a plaintiff must demonstrate "potential harm which cannot be redressed by a legal or equitable remedy following trial." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir.1989)). Once this protected in-

formation is disclosed to the general public via the Internet, it will permanently and irreversibly be stripped of its confidential status. Even if Plaintiffs' home addresses are subsequently removed the Internet registry following final resolution of Plaintiffs' privacy claims, there is no legal or equitable remedy available to retrieve this information and prevent its further dissemination by those who, in the interim, will have accessed the web site.

Moreover, a grant of limited injunctive relief will not prevent the State from posting the vast majority of registration information on the Internet registry or continuing to affirmatively distribute notification flyers under the existing notification scheme to a significant segment of the public likely to encounter registered offenders As such, any potential danger posed to the community which results from postponing operation of the Internet registry does not outweigh the irreparable harm posed to Plaintiffs constitutional rights. In any event, registrants' individual rights guaranteed by the United States Constitution must take precedence over the State's interest to make this protected information available to the broadest segment of the public. The interests of the public are necessarily promoted when individual rights to privacy are protected from unwarranted state intrusion. Accordingly, Plaintiffs have satisfied the Court that they are entitled to a preliminary injunction preventing the State from granting unrestricted public access to Plaintiffs' home addresses via the Internet pursuant to N.J.S.A. § 2C:7–13(g).

◼ The State argues that any injunction issued by this Court to protect Plain-

---

**27.** It is instructive to note that, in *Doe v. Kelley,* plaintiffs challenged an amendment to Michigan's Sex Offenders Registration Act which made registry information fully available for public inspection upon request at the local law enforcement agency having jurisdiction over the respective zip code area in which the specific registrant resides. 961 F.Supp. at 1107.

tiffs' interests in limiting the disclosure of their home addresses should be limited to precluding the exact home address from inclusion on the Internet registry and should not mandate the exclusion of the "general vicinity of a sex offender's home address, as it is only the exact home address that arguably is protected under the federal constitution." Def.'s Br. at 24.[28] The precise scope of information entitled to protection from unlimited disclosure to the general public is unclear. The Third Circuit addressed a similar issue with respect to the Redacted Notices distributed under the existing system of community notification:

> The single issue raised with respect to the Redacted Notices is this: the "governmental disclosure of one's street name, block of residence, and name of apartment building . . . breaks the veil of anonymity surrounding one's place of residence" and, thus, infringes upon appellants' privacy interest. Again, we disagree. Whatever privacy interest, if any, may exist in the area of one's residence, i.e., street name, block of residence, or name of apartment building, however, is substantially outweighed by the state's compelling interest in disclosing Megan's Law information to the relevant public, an interest recognized in *Paul P. I*.

*Paul P. II*, 227 F.3d at 105 (internal quotations and citations omitted). While finding that registrants' privacy interests had therefore been afforded adequate protection, the Court stressed the limited scope of disclosure permitted by the notification guidelines:

> *Redacted Notices, it must be remembered, are not released wily-nily to the general public.* Rather, they are generally given only to individuals within the court-authorized notification zone, individuals who are otherwise authorized to receive an Unredacted Notice, but who do not sign a receipt form. Any burden imposed on appellants as a result of the identification of a quite specific area of residence, albeit not the precise home address itself, simply does not trump the state's interest in providing that information to authorized individuals within the court-authorized notification zone.

*Id.* (emphasis added). In light of the broad scope of disclosure authorized by the Internet Registry Act, the burden imposed by the release of information regarding Plaintiffs' specific area of residence is substantially higher. Moreover, any state interest in extending disclosure beyond the court-ordered notification zone to the general public without regard to the public safety-related goals of the legislation is likewise significantly reduced. Providing unlimited access via the Internet to the name of the specific street, block of residence, apartment building, or even municipality in which a registrant resides may permit numerous individuals with no legitimate public safety-related need for the information to quickly ascertain an offender's precise home address. For purposes of this motion, the Court need not conclusively decide this issue. The purpose of a preliminary injunctive relief, where appropriate, is to prevent irreparable harm to the plaintiffs by preserving the status quo pending the court's final determination of plaintiffs' claims on the merits. Accordingly, in order to provide meaningful protection to Plaintiffs' privacy interests pending final resolution of this issue, the Court determines that it is necessary to limit the content of the information which may be permissibly disclosed to the county in which the offender resides.

---

**28.** The Act currently authorizes the release of "the street address, zip code, municipality and county in which the offender resides." N.J.S.A. § 2C:7–13(g).

Before granting partial injunctive relief, however, the Court must briefly consider whether this specific feature of the Act is severable from the remainder of the legislation. The issue of severability is generally a question of state law. *See Trade Waste Management Ass'n v. Hughey,* 780 F.2d 221, 231 (3d Cir.1985). Under New Jersey law, the central inquiry in determining the severability of a specific clause or provision is whether the legislature intended that the challenged Act "should stand or fall as a unitary whole." *Inganamort v. Borough of Fort Lee,* 72 N.J. 412, 422, 371 A.2d 34 (1977). New Jersey's Internet Registry Act contains a broad severability clause:

> The provisions of this act shall be deemed to be severable, and if any phrase, clause, sentence, word, or provision of this act is declared to be unconstitutional, invalid, or inoperative in whole or in part, or the applicability thereof to any person is held invalid, by a court of competent jurisdiction, the remainder of this act shall not thereby be deemed to be unconstitutional, invalid, or inoperative and, to the extent it is not declared unconstitutional, invalid or inoperative, shall be effectuated and enforced.

N.J.S.A. 2C:7-6. The incorporation of a broad severability clause is evidence of the legislature's intent and creates a presumption that the invalid sections of the statute are severable. *See Id.* However, in order to ascertain the intent of the legislature, the Court must further determine "whether the objectionable feature of the statute can be excised without substantial impairment of the principal object of the statute." *Id.* at 422, 371 A.2d 34. Here, partially enjoining disclosure with respect to a single piece of registry information—Plaintiffs' home addresses—can be enjoined without disturbing the core objectives of the Act. A partial injunction will not prevent the State from disclosing the vast majority of identifying information contained in the Internet registry and therefore will not substantially undermine Act's central purpose: providing the general public with a broad range of identifying information about persons determined to present a continuing threat to the community so that members of the public can take appropriate precautions to protect themselves, their families, and those in their care. Partial injunctive relief is therefore appropriate.

## IV.

For the reasons set forth above, Plaintiffs' motion to enjoin implementation of the Internet Registry Act is granted in part. The Court will enter an order enjoining the State from granting unrestricted public access to registry information identifying the house or apartment number, street, zip code, and municipality in which the Plaintiffs' reside pursuant to N.J.S.A. § 2C:7-13(g) of the Act. Plaintiffs' motion to enjoin implementation of the remaining provisions of Act is denied. The Court will enter an appropriate order.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION OF THE INTERNET REGISTRY ACT, N.J.S.A. §§ 2C:7-12—19

This matter having appeared before the Court upon Plaintiff's motion for a preliminary injunction, and the Court having reviews the submissions of the parties and having heard oral arguments, for the reasons set forth in an opinion issued by this Court, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing,

**IT IS** on this 6th day of December, 2001,

**310**

**ORDERED THAT:** Plaintiffs' motion for a preliminary injunction preventing the implementation of P.L. 2001, ch. 167 (codified at N.J.S.A. §§ 2C:7–12 to –19) is **DENIED** provided that the Internet Registry **MUST EXCLUDE** information identifying the home or apartment number, street, zip code, and municipality in which Plaintiffs' reside.